*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CALVIN GEORGE MAGER,

        Defendant-Appellant.

UNPUBLISHED
February 09, 2026
11:44 AM

No. 373196
Marquette Circuit Court
LC No. 2023-062234-FC

Before: O'BRIEN, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b (multiple variables), and second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(b) (relationship). Defendant was sentenced to concurrent terms of 15 to 30 years' imprisonment for the CSC-I conviction and 10 to 15 years' imprisonment for the CSC-II conviction. He received 72 days of jail credit for each sentence. On appeal, defendant contends his rights were violated when the trial court did not allow him to present certain evidence on the basis that it violated the rape-shield statute, MCL 750.520j, there was insufficient evidence supporting his convictions, defense counsel was ineffective, and the trial court erroneously assessed Offense Variable (OV) 8. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

When the victim, GR, was approximately 10 years old, she moved in with her great aunt, MM, at her house in Negaunee.[1] MM's husband, defendant, and daughter, LM, also lived at the home.[2] GR referred to defendant and MM as "[m]om and [d]ad," and viewed LM as her sister. MM and defendant were GR's guardians and treated her like their daughter until she moved out in

---

[1] GR's mother could not take care of GR after she was born. GR lived with two of her great aunts, respectively, before living with MM and defendant.

[2] Defendant was LM's adoptive father.

2022 when she was 16 years old. Shortly before GR moved out, defendant's adult son moved in with his wife, CR, and their child. MM was responsible for disciplining GR. GR testified that they did not have a good relationship. GR feared MM because her punishments included yelling and physical abuse.[3] GR's relationship with defendant was "all right" until her last two years living at the home, and she used to consider him as her protector.

GR testified that the first incident of abuse occurred at a cabin owned by MM and defendant on a property located in a desolate area of Marquette County during the summer before GR started her freshman year of high school, or when she was 14 years old.[4] Because MM and GR were fighting and needed space, defendant took GR to the cabin for an overnight trip. Later that day after arriving at the cabin, defendant encouraged GR to take off her shorts. While GR was sitting on the couch and wearing only a shirt and underwear, defendant repeatedly pushed her down by the shoulders until she was lying down. Defendant got on top of GR in between her legs and began to "rub his penis against [her] vagina." After bringing GR to the bed, defendant asked GR if she "ever orgasmed," and she answered, "no." Defendant began touching GR's vagina "over [her] clothes." Defendant removed his penis from his boxers and told GR to touch it with her hand. While doing so, defendant told GR to spit on his penis. GR put defendant's penis in her mouth and "gave him a blow job[.]" While defendant was standing and GR was on her knees, defendant ejaculated "on the floor."

GR waited about one month before telling MM about the first incident. When GR told MM about defendant's actions, she thought GR "was lying." MM did not believe GR and instead directed her to write a letter apologizing to defendant for lying. GR testified that writing apology letters was a common form of punishment while living at the home, otherwise MM would withhold GR's privileges.

On another occasion when GR was 15 years old, she visited the cabin with defendant and LM. While at the cabin, GR asked defendant for the WiFi password at the home (not the cabin) because MM had changed the password and GR wanted to use a cell phone.[5] Defendant told GR she would need to "do something for him," but GR refused. Before leaving the cabin the next day, defendant told GR he would give her part of the WiFi password if she "let him suck on [her] boobs[.]" GR lifted her shirt and bra and defendant "suck[ed] on one of [GR's] breasts" and held the other with his hand for about five minutes until GR pulled away. Defendant gave GR part of the password. The next day, while back at the home, GR asked defendant for the rest of the password before leaving for school. Defendant was sitting on the couch and told GR he wanted " 'more,' " at which point GR "lifted up [her] shirt and [her] bra." Defendant "suck[ed] on one of

---

[3] MM denied physically abusing GR. In 2021, Michigan State Police investigated an incident at the home, inquiring how the children were disciplined.

[4] During trial, the cabin was also referred to as the "camp." The cabin has a combined bedroom and living room area, a kitchen and dining area on the main floor, and an upstairs loft.

[5] GR noted MM did not allow her to have the cell phone. GR thus asked for the password outside of MM's presence.

[GR's] breasts and knead[ed] the other" for a short amount of time. When defendant was finished, GR pulled down her shirt and defendant provided the entire password.

GR testified regarding another occasion when defendant purchased her a cell phone when she was 16 years old and they were travelling to the cabin. Defendant told GR not to tell MM about the cell phone and that he wanted "something in return[.]" At the cabin, while watching a movie, GR rested her head on a pillow on defendant's lap. After the movie, when GR went to sleep in a camper on the property, defendant came outside and "demanded the phone back" because "he didn't get what he wanted." The next morning, while lying down next to one another, defendant touched GR on the outside and underneath her clothes. After defendant put his fingers inside of GR's vagina, he tried putting GR's hand on his penis, but she pulled away. This incident lasted for about seven minutes. Defendant used the bathroom and gave GR her phone back. Sometime during the trip, MM discovered the phone that defendant purchased for GR. MM believed that GR's friend, and not defendant, gave GR the phone. GR stated that MM struck her "a couple times."[6] GR testified that defendant was disappointed that GR told MM about the cell phone.

GR further testified that, during Christmas break one year, defendant took a Chromebook laptop GR was borrowing from a friend from her bedroom at the home. When GR went downstairs, defendant demanded a blow job to return the laptop. GR declined and returned to her bedroom. The next morning, GR told defendant that she "was willing to give him a blow job" to get back her laptop. While in defendant's bedroom, GR "got on [her] knees and [she] let [her] mouth around his penis." Eventually, defendant ejaculated on a towel and returned the laptop to GR. GR testified regarding other incidents when defendant would hug her and "grab [her] butt."

While living at the home, MM frequently took away GR's electronic devices because she broke the household rules and had "a problem" using such devices. MM required GR "to be on good behavior" to get her phone back. MM purchased two or three cell phones for GR before she had "any problems." At some point, MM disallowed GR from possessing a cell phone or laptop as a form of discipline "after she had gotten in trouble a few times[.]" MM testified that she caught GR with 10 to 15 other phones she obtained from friends. GR testified that she had a cell phone or other device taken away on at least five separate occasions, but no more than 10 occasions. And more than once, GR had a cell phone taken away "for doing things [she] shouldn't have been doing on them[.]" GR and MM often got into arguments when MM discovered a device GR obtained from a friend.

On January 25, 2022, MM found various items, including "ear pods" in GR's backpack, which belonged to GR's friend, and destroyed them. MM searched GR's wallet and took away two gift cards. Sometime that evening, GR became upset and ran away. About 45 minutes later, a friend drove GR to the Negaunee City Police Department. GR arrived at the police station as a runaway and, while she was there, reported sexual abuse allegations. Officer Michael Gorman, a Negaunee police officer, began conducting an intake interview in the lobby. After GR reported

---

[6] MM denied striking GR physically.

sexual abuse allegations, she was taken to a private interview room for additional questioning.[7] Officer Gorman authored a report and referred the case to a detective, who scheduled a forensic interview. CR picked up GR from the police station on January 25, 2022. GR lived with CR until April 2022 because of the ongoing issues with defendant and MM. When GR informed CR about the allegations, CR did not believe GR. GR spoke to another female police officer on January 31, 2022. Although MM spoke to the police about GR's allegations, she testified that she "wouldn't stay with somebody that [she] thought was molesting a child."

Defendant was charged with one count of CSC-I and one count of CSC-II. At the end of a two-day jury trial, the jury found defendant guilty of both CSC-I and CSC-II. Defendant was sentenced as described, and now appeals. Defendant also moved in this Court for a remand to the trial court for an evidentiary hearing under *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973) ("*Ginther* hearing"), regarding ineffective assistance of counsel. The motion was denied without prejudice "for failure to persuade the Court of the necessity of a remand at this time." *People v Mager*, unpublished order of the Court of Appeals, entered May 19, 2025 (Docket No. 373196).

## II. EXCLUSION OF EVIDENCE

Defendant argues that the trial court's exclusion of certain evidence on the basis it constituted sexual conduct under the rape-shield statute denied him a fair trial and right to present a defense.

## A. PRESERVATION AND STANDARDS OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). At trial, defense counsel asked GR whether she was forbidden from possessing a cell phone and laptop because she sent nude photographs to men. GR answered: "Yes." The prosecutor objected, contending the testimony was inadmissible sexual conduct under the rape-shield statute. Defense counsel argued that the conduct contextualized why GR was not allowed to have devices . The trial court sustained the objection. Defense counsel further argued the jury should hear that GR did not have certain electronic devices because of her conduct online, arguing:

> I think both under the [C]onfrontation [C]lause and I think that under [*People v Morris*] and [*People v Curran*], certainly conduct even under [the rape-shield statute], that's evidence of prior sexual assault on the complainant or that can explain age inappropriate sexual knowledge that was not learned from the [d]efendant or to show motive to make false charges. I think all of those things have come back from the Court of Appeals as reasons that the evidence should have been allowed and I believe that that applies here.

---

[7] Officer Gorman noted that GR spoke to him and Officer Baldini. At one point, Officer Gorman told GR to " 'cut the s***' " and tell the truth.

The trial court held that the evidence was inadmissible under the rape-shield statute and allowed testimony showing that GR "was disciplined by removing her privileges to use those devices" because GR "admitted that."

Defendant's argument that the trial court abused its discretion by excluding the testimony regarding nude photographs under the rape-shield statute is preserved for appellate review. To the extent defendant argues his right of confrontation was violated, that argument is also preserved for appellate review. However, because defendant did not expressly assert that his rights to present a defense or to a fair trial were violated, those arguments are not preserved for appellate review. See *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) ("To preserve for review by this Court a constitutional-error claim that implicates a defendant's due-process rights, the issue must be raised in the trial court.").

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Thorpe*, 504 Mich at 251. "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes. A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. at 251-252 (quotation marks and citations omitted). "To the extent that the trial court's evidentiary decision involves underlying questions of law, such as whether a statute precludes admissibility of evidence, this Court reviews those questions of law de novo." *People v Sharpe*, 502 Mich 313, 324; 918 NW2d 504 (2018).

When a constitutional issue is preserved, this Court reviews that issue de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018). However, regarding defendant's unpreserved constitutional arguments:

> We review defendant's unpreserved constitutional claim for plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Under the plain-error rule, defendant bears the burden to prove (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings. *Id*. at 763. If defendant satisfies those three requirements, we must make a fourth determination: whether the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence. *Id*. [*Anderson*, 341 Mich App at 279-280 (quotation marks omitted).]

This Court reviews questions of statutory interpretation de novo. *Wiley*, 324 Mich App at 150. "When interpreting a statute, our primary goal is to ascertain and give effect to the Legislature's intent. If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning and we enforce the statute as written." *Sharpe*, 502 Mich at 326-327 (quotation marks and citations omitted). "Nontechnical words and phrases should be interpreted according to the common and approved usage of the language. When a word or phrase is not defined by the statute in question, it is appropriate to consult dictionary definitions to determine the plain and ordinary meaning of the word or phrase." *People v Rea*, 500 Mich 422, 428; 902 NW2d 362 (2017) (quotation marks and citation omitted).

## B. RAPE-SHIELD STATUTE

The trial court did not abuse its discretion by excluding evidence regarding GR's prior sexual conduct under the rape-shield statute.

The rape-shield statute "serves to limit the admissibility of evidence of a complainant's sexual conduct." *Sharpe*, 502 Mich at 325. MCL 750.520j governs the admissibility of evidence of a victim's sexual conduct, providing:

> (1) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections 520b to 520g unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
>
> (a) Evidence of the victim's past sexual conduct with the actor.
>
> (b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.
>
> (2) If the defendant proposes to offer evidence described in subsection (1)(a) or (b), the defendant within 10 days after the arraignment on the information shall file a written motion and offer of proof. The court may order an in camera hearing to determine whether the proposed evidence is admissible under subsection (1). If new information is discovered during the course of the trial that may make the evidence described in subsection (1)(a) or (b) admissible, the judge may order an in camera hearing to determine whether the proposed evidence is admissible under subsection (1). [MCL 750.520j (footnote omitted).]

The Legislature did not define "sexual conduct," but our Supreme Court recently interpreted the phrase's meaning:

> "Sexual" is defined as "of, relating to, or associated with sex or the sexes" or "having or involving sex[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed). "Sex" has been defined as "the instinct or attraction drawing one individual sexually toward another, or the cultural phenomena, behavior, or activities that it motivates." *Random House Webster's College Dictionary* (2001). "Conduct" is defined as "a mode or standard of personal behavior esp[ecially] as based on moral principles" or "the act, manner, or process of carrying on[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed). The definition of "conduct" refers to "personal behavior." See *id*. "Behavior" is defined as "the way in which someone behaves"; "the manner of conducting oneself"; "anything that an organism does involving action and response to stimulation"; or "the way in which something functions or operates[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed); see also *Random House Webster's College Dictionary* (2d ed) (defining "behavior" as "the aggregate of responses to internal and external stimuli"). [*People v Masi*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 165620); slip op at 6.]

Our Supreme Court further explained: "[W]e interpret the plain meaning of 'sexual conduct' in MCL 750.520j(1) as encompassing individual behaviors—including acts and responses—that involve or are associated with sexual activities." *Id.* at ___; slip op at 6-7. "[A] specific instance of the victim's sexual conduct must relate to a particular occurrence of the victim's sexual conduct." *Sharpe*, 502 Mich at 328.

Initially, we recognize that defendant was not seeking to admit any witness testimony regarding GR's sexual reputation or an opinion concerning her sexual conduct. Nor did the evidence involve GR's sexual conduct with defendant or show "the source of origin of semen, pregnancy, or disease." MCL 750.520j(1).

Rather, the crux of the issue is whether the evidence regards a specific instance of GR's sexual conduct. Applying the definitions, sending nude photographs to unnamed men online constituted a specific instance of GR's sexual conduct because it was a personal act involving a sexual activity. Defendant's reliance on *Sharpe* is misguided. In that case, the Court held that evidence of the victim's pregnancy and abortion did "not fall under the purview of the rape-shield statute" because the evidence was "not evidence of a specific instance of the victim's sexual conduct." *Sharpe*, 502 Mich at 328-329. However, whereas that evidence "alone d[id] not describe a particular or specific sexual encounter," *id.* at 328, evidence that GR sent nude photographs of herself to others over her phone refers to specific conduct. The act of taking nude photographs and sending them to men online is quintessentially sexual conduct, unlike evidence of a pregnancy and an abortion, which merely "constitute[d] a consequence of or relate[d] to sexual activity generally." *Id.*

Defendant cites *People v Morse*, 231 Mich App 424; 586 NW2d 555 (1998), overruled in part by *Masi*, ___ Mich at ___; slip op at 2, to assert that sending nude photographs is similar to viewing pornography, which is not considered sexual conduct under the rape-shield statute. However, *Morse* did not discuss whether viewing pornography was sexual conduct, as the trial court excluded defendant's evidence of similar sexual assaults committed by another individual under the rape-shield statute. *Morse*, 231 Mich App at 428.

More relevant is *Masi*, ___ Mich at ___; slip op at 2, 13-17, where the Court held that "evidence related to prior sexual abuse of a minor is 'sexual conduct' under MCL 750.520j(1)," "overrule[d] the admissibility test articulated in *Morse* to the extent that it require[d] evidence of a prior conviction," and remanded to the trial court for "an *in camera* evidentiary hearing to apply the new standard[.]" In *Masi*, *id.* at ___; slip at 1-2, the defendant argued that the evidence the victim "viewed pornography during the course of alleged sexual abuse committed by [the victim's] uncle is not 'sexual conduct' under MCL 750.520j(1) and thus is not barred under the rape-shield statute." The Court concluded "that the same policy considerations underlying the rape-shield statute's general prohibition into a complainant's consensual sexual history apply equally to involuntary acts or nonconsensual sexual behavior." *Masi*, ___ Mich at ___; slip op at 11.

Earlier, in *Masi*, 346 Mich App 1, 15, 17-18; 11 NW3d 521 (2023), this Court held that "[e]vidence that [the victim] had viewed pornography alone, without more, is not 'sexual conduct' for purposes of the rape-shield statute," and remanded "for the trial court to determine whether the evidence is otherwise admissible under the rules of evidence." However, when the "evidence of pornographic exposure came in the context of sexual-abuse allegations," the evidence "falls within

the rape-shield's prohibition on evidence of a victim's sexual conduct because it occurred amidst alleged acts of sexual abuse perpetrated by Uncle Robby." *Id*. at 15.  Importantly, the Supreme Court "affirm[ed] the Court of Appeals' holding that evidence that AU viewed pornography with her Uncle Robby during the course of alleged sexual abuse was 'sexual conduct' subject to the protections of the rape-shield statute." *Masi*, ___ Mich at ___; slip op at 12.  The Court did not consider this Court's holding in *Masi*, 346 Mich App at 15, that the viewing of pornography by itself was not sexual conduct "because that holding [was] not challenged on appeal[.]" *Masi*, ___ Mich at ___; slip op at 3 n 1.

At trial, defendant sought to admit the evidence to explain why GR was prohibited from having electronic devices, such as a laptop or cell phone.  Defendant argued that the evidence showed "age inappropriate sexual knowledge that was not learned from [] [d]efendant," or that GR had a "motive to make false charges."  But because the evidence related to sexual conduct by GR, the trial court did not abuse its discretion in excluding it under the statute.

A similar factual scenario was presented to this Court in *People v Amenitsch*, unpublished per curiam opinion of the Court of Appeals, issued September 12, 2024 (Docket No. 365261), pp 1-3.[8]  In *Amenitsch*, the defendant, who had sexually assaulted the victim, sought to introduce evidence "regarding a sexting incident involving [the victim]." *Id*. at 1-2.  Before the assault, the victim used her cell phone to send "sexually explicit photographs of herself to an unknown third party." *Id*. at 2.  Before trial, the prosecution sought to preclude the evidence, arguing that it was sexual conduct under the rape-shield statute. *Id*.  At a hearing, the defendant stated that he no longer sought admission of the "photographs related to the sexting incident." *Id*.  After the trial court determined that "the sexting was covered under the rape-shield statute," *id*. at 8, the parties stipulated that "neither side would present evidence of either the police investigation of the contents of [the victim's] cell phone." *Id*. at 2.  Having consulted the dictionary to define "sexual conduct," this Court "conclude[d] that the sexting incident constituted 'sexual conduct,' " explaining:

> [T]he text messages that [the victim] shared with an unknown third party contained sexually explicit images of her.  Although this does not pertain directly to sexual intercourse, it is nevertheless sexual in nature and constitutes an action on behalf of [the victim].  Unlike the *viewing* of pornography at issue in *Masi*, [346 Mich App 1,] which might have been passive, accidental, or the result of curiosity, here, the conduct involved [the victim] generating a depiction of herself engaged in sexually explicit conduct, then *sending* it to someone else.  This is squarely within the definition of "sexual conduct." [*Amenitsch*, unpub op at 9-10.]

The trial court in *Amenitsch* determined the evidence "was inadmissible under the rape-shield statute, and the trial court properly determined so." *Id*. at 10.  The facts in this case are similar to those presented in *Amenitsch*, and the evidence regarding GR sending nude photographs to unknown adult men was similarly inadmissible.

---

[8] "Unpublished decisions are not binding on this Court, but the Court may consider them for their persuasive value." *People v Otto*, 348 Mich App 221, 245 n 11; 18 NW3d 336 (2023).

C. RELATED ARGUMENTS

Nor did exclusion of the evidence constitute a plain error affecting defendant's substantial rights regarding his right to present a defense or his right to a fair trial.

"The United States Constitution and the Michigan Constitution each guarantee that a criminal defendant receives due process of law." *People v Horton*, 341 Mich App 397, 401; 989 NW2d 885 (2022); see also US Const, Am. XIV; Const 1963, art 1, § 17. "Implicit in this guarantee is that each criminal defendant enjoys the right to a fair trial, and essential to a fair trial is the defendant's right to be presumed innocent." *Horton*, 341 Mich App at 401. Further, a "criminal defendant has a due process right to present a defense under the state and federal Constitutions." *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016); see also US Const, Ams VI and XIV; Const 1963, art 1, § 13.

> [T]he right to present a defense is not absolute. The defendant must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Accordingly, the right to present a defense extends only to relevant and admissible evidence. [*Solloway*, 316 Mich App at 198 (quotation marks and citations omitted).]

To that point, the rape-shield statute "constitutes a legislative policy determination that sexual conduct or reputation regarding sexual conduct as evidence of character and for impeachment, while perhaps logically relevant, is not legally relevant." *Sharpe*, 502 Mich at 326 (quotation marks and citation omitted). "The statute also reflects a belief that inquiries into sex histories, even when minimally relevant, carry a danger of unfairly prejudicing and misleading the jury. Finally, the statute protects the privacy of the alleged victim and, in so doing, removes an institutional discouragement from seeking prosecution." *Id.* (quotation marks and citations omitted).

Because the trial court did not abuse its discretion by precluding testimony regarding GR's prior incidents of sending nude photographs to adult men online, defendant was not deprived of his right to a fair trial or his right to present a defense.

Defendant also argues that his confrontation rights were violated because he had a right to cross-examine GR regarding her sending of nude photographs to other men.

The Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" US Const, Am VI. See also Const 1963, art 1, § 20. "A primary interest secured by the Confrontation Clause is the right of cross-examination." *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993). "The right of cross-examination is not without limit; neither the Confrontation Clause nor due process confers an unlimited right to admit all relevant evidence or cross-examine on any subject." *Id.* A defendant is guaranteed "a reasonable opportunity to test the truth of a witness' testimony." *People v Hackett*, 421 Mich 338, 347; 365 NW2d 120 (1984).

The rape-shield statute "bars, with two narrow exceptions, evidence of *all* sexual activity by the complainant not incident to the alleged rape." *People v Duenaz*, 306 Mich App 85, 91; 854 NW2d 531 (2014) (quotation marks and citation omitted). "In addition to the enumerated

exceptions within the rape-shield statute, evidence of a complainant's sexual conduct may be admitted to preserve the defendant's constitutional right to confrontation." *Sharpe*, 502 Mich at 325 n 6. "Because the statute excludes evidence that in most cases would be only minimally relevant, the statute's prohibitions do not deny or significantly diminish a defendant's right of confrontation." *Duenaz*, 306 Mich App at 91-92.

Defendant's argument regarding his confrontation rights is abandoned on appeal because the issue was not raised in the statement of the questions presented. See *People v McMiller*, 202 Mich App 82, 83 n 1; 507 NW2d 812 (1993) (stating that an issue is abandoned on appeal when the issue was not included "in the statement of issues presented"); see also MCR 7.212(C)(5). In any event, this argument fails on the merits because the trial court did not abuse its discretion by excluding the evidence under the rape-shield statute, and the trial court afforded defendant the opportunity to cross-examine GR regarding her being disciplined for improper use of the phone, preserving his ability to effectively cross-examine GR. See *Hackett*, 421 Mich at 349 ("In exercising its discretion, the trial court should be mindful of the significant legislative purposes underlying the rape-shield statute and should always favor exclusion of evidence of a complainant's sexual conduct where its exclusion would not unconstitutionally abridge the defendant's right to confrontation.").

## III. SUFFICIENCY OF THE EVIDENCE

Defendant contends GR's testimony was insufficient to support his convictions because it failed to establish the elements of CSC-I and CSC-II beyond a reasonable doubt.

## A. STANDARD OF REVIEW

"Challenges to the sufficiency of the evidence are reviewed de novo." *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). "We view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses." *People v Kenny*, 332 Mich App 394, 403; 956 NW2d 562 (2020).

## B. ANALYSIS

There was sufficient evidence supporting defendant's convictions of one count of CSC-I and one count of CSC-II.

"[D]ue process requires the prosecution to prove every element beyond a reasonable doubt." *People v Smith*, 336 Mich App 297, 308; 970 NW2d 450 (2021) (quotation marks and citation omitted). See also US Const, Ams V, VI, and XIV; Const 1963, art 1, §§ 17 and 20.

-10-

Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution. [*Kenny*, 332 Mich App at 403 (quotations marks and citations omitted).]

Defendant was convicted of one count of CSC-I under MCL 750.520b and one count of CSC-II under MCL 750.520c(1)(b). The CSC-I conviction stemmed from "[m]ultiple [v]ariables," and the prosecutor alleged that defendant engaged in sexual penetration (fellatio) and "the victim was at least 13 but less than 16 years of age and defendant and victim were members of the same household. . . ." MCL 750.520b(1) states in relevant part:

A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:

(a) That other person is under 13 years of age.

(b) That other person is at least 13 but less than 16 years of age and any of the following:

(*i*) The actor is a member of the same household as the victim.

" 'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(r).

Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could conclude the elements of CSC-I were established beyond a reasonable doubt. As recounted before, GR testified regarding a specific instance at the cabin—when she was 14 years old—where defendant encouraged GR to take off her shorts and, after she did, she was wearing only her shirt and underwear. Defendant repeatedly pushed GR "down against the couch" by her shoulders until she was lying down, and rubbed his penis against GR's vagina. After, defendant touched GR's vagina "over [her] clothes,", defendant removed his penis from his boxers and instructed GR to touch it with her hand, which she did, and defendant told GR to spit on his penis. GR put defendant's penis in her mouth and "gave him a blow job[.]" While defendant was standing and GR was on her knees, defendant ejaculated "on the floor." This specific evidence was more than sufficient to allow a jury to conclude beyond a reasonable doubt that defendant committed CSC-I against GR.

The CSC-II conviction stemmed from a "[r]elationship," and the prosecutor alleged that defendant engaged "in sexual contact with: a child who was at least 13 but less than 16 years of age, and [] defendant and victim were members of the same household[.]" MCL 750.520c(1) states in pertinent part:

-11-

A person is guilty of criminal sexual conduct in the second degree if the person engages in sexual contact with another person and if any of the following circumstances exists:

(a) That other person is under 13 years of age.

(b) That other person is at least 13 but less than 16 years of age and any of the following:

(*i*) The actor is a member of the same household as the victim.

"Sexual contact" is defined as

the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for:

(*i*) Revenge.

(*ii*) To inflict humiliation.

(*iii*) Out of anger. [MCL 750.520a(q).]

" 'Intimate parts' includes the primary genital area, groin, inner thigh, buttock, or breast of a human being." MCL 750.520a(f). "And when determining whether touching could be reasonably construed as being for a sexual purpose, the conduct should be viewed objectively under a reasonable person standard." *People v DeLeon*, 317 Mich App 714, 719-720; 895 NW2d 577 (2016) (quotation marks and citation omitted).

Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could conclude the elements of CSC-II were established beyond a reasonable doubt. GR testified regarding another visit to the cabin with defendant and LM when GR was 15 years old, where defendant sucked on one of GR's breasts and fondled the other in exchange for defendant giving GR the new WiFi password at home. GR then testified to a second similar incident that occurred the next day at home.

In challenging the sufficiency of the evidence, defendant asserts that there "was no additional medical, scientific, or additional eyewitness testimony to support the allegations." However, "[i]n criminal sexual conduct cases, a victim's testimony may be sufficient to support a defendant's conviction and need not be corroborated." *Solloway*, 316 Mich App at 181. See also MCL 750.520h and *People v Bailey*, 310 Mich App 703, 714; 873 NW2d 855 (2015) ("[A] complainant's testimony regarding a defendant's commission of sexual acts is sufficient evidence to support a conviction for CSC-I[.]"). Officer Gorman testified that GR's trial testimony was consistent with the allegations asserted during her interview, including the "first" incident at the

cabin.[9] To the extent defendant contends the victim's testimony was speculative or unreliable, "witness credibility is a question for the fact-finder, and this Court does not interfere with the fact-finder's role." *Solloway*, 316 Mich App at 181-182. Further, witness credibility " 'is a matter of weight, not sufficiency.' " *People v Baskerville*, 333 Mich App 276, 283; 963 NW2d 620 (2020), quoting *People v Scotts*, 80 Mich App 1, 9; 263 NW2d 272 (1977).

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts that his trial counsel was ineffective by failing to prepare a proper defense and by failing to fully investigate the matter when defense counsel did not (a) offer as evidence letters written by GR and (b) review GR's forensic interview.

## A. PRESERVATION AND STANDARDS OF REVIEW

To preserve an ineffective assistance of counsel argument for review, "a defendant must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective," *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), or move in this Court for remand to the trial court for a *Ginther* hearing, *People v Abcumby-Blair*, 335 Mich app 210, 227; 966 NW2d 437 (2020). This Court denied defendant's motion to remand to the trial court for a *Ginther* hearing, so this issue is preserved for appellate review. Generally, "[w]hen reviewing an ineffective assistance of counsel claim, this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of law." *People v Shaw*, 315 Mich App 668, 671-672; 892 NW2d 15 (2016). "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *Id*. at 672. Because a *Ginther* hearing was not held, "our review is limited to mistakes apparent on the record." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

## B. ANALYSIS

Contrary to defendant's arguments, defense counsel was not ineffective for failing to seek admission of GR's letters as exhibits or to review the forensic interview. Neither a new trial nor a remand for an evidentiary hearing is warranted.

"The right to counsel guaranteed by the United States and Michigan Constitutions, US Const Am VI; Const 1963, art 1, § 20, is the right to the effective assistance of counsel." *Shaw*, 315 Mich App at 672. "A defendant must meet two requirements to warrant a new trial because of the ineffective assistance of trial counsel." *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011). "First, the defendant must show that counsel's performance fell below an objective standard of reasonableness." *Id*. at 290; see also *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). "In doing so, the defendant must overcome the strong presumption that counsel's

---

[9] Officer Gorman did not include in his report that GR gave defendant a blow job to get back her Chromebook but, rather, only that defendant had asked for one. Officer Gorman stated it was possible GR did not disclose every allegation during the initial interview because of time constraints and the need for a forensic interview.

assistance constituted sound trial strategy." *Armstrong*, 490 Mich at 290. "Second, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable." *Id.*, see also *Strickland*, 466 US at 694-696. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks and citation omitted). The second prong "require[s] a showing of prejudice[.]" *People v Randolph*, 502 Mich 1, 14; 917 NW2d 249 (2018). "Trial counsel is responsible for preparing, investigating, and presenting all substantial defenses." *People v Thorne*, 322 Mich App 340, 347; 912 NW2d 560 (2017) (quotation marks and citation omitted). "Counsel always retains the 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012), quoting *Strickland*, 466 US at 690-691.

With respect to the admission of GR's handwritten apology letters into evidence, defendant contends that there were "several letters of apology written by GR in which she admitted to lying about the allegations." Defendant included, however, only two letters in his motion to remand for a *Ginther* hearing, each featuring notations stating that GR wrote the letters about two or three months after the first incident at the cabin. One of the letters stated that GR wrote it "after accusing [defendant] of skinny dipping." One letter stated: "Sorry for twisting the words you say into naste [sic], dirty things." The other letter broadly stated: "[Y]ou know what I lied[.]"

This issue is abandoned on appeal because defendant did not fully brief the argument nor explain how the letters were admissible, merely asserting that defense counsel "did not delve into the nature of the letters" while cross-examining GR. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) (quotation marks and citation omitted) ("Failure to brief a question on appeal is tantamount to abandoning it.").

Regardless, as defendant recognizes on appeal, defense counsel did cross-examine GR regarding the letters and GR did not deny writing them, as indicated by the following exchange:

> *Q.* And [the prosecutor] asked you about disclosing to [MM]?
>
> *A.* Yes
>
> *Q.* And you said not immediately; is that correct?
>
> *A.* Yeah.
>
> *Q.* And you did say that [MM] didn't believe you; correct?
>
> *A.* Yeah.
>
> *Q.* After that incident, did you write a letter of apology to [defendant]?
>
> *A.* Yes.
>
> *Q.* Saying that you had lied about your allegations?
>
> *A.* Yes, because [MM] made me. [MM] told me that I needed to apologize.

-14-

*Q.* I want to object to saying any hearsay from [MM], but did you write a letter to [defendant]?

*A.* Yes.

*Q.* Did you tell him that you were sorry for twisting his words into nasty, dirty things?

*A.* Yes.

That defense counsel did not seek to introduce the letters as exhibits did not constitute deficient performance. On the contrary, defense counsel successfully elicited testimony that GR wrote the letters to apologize for lying about the allegations, which allowed the jury to hear testimony that GR wrote the letters and did not dispute their substance. Defendant cannot "overcome the strong presumption that counsel's assistance constituted sound trial strategy." *Armstrong*, 490 Mich at 290.

Moreover, defendant cannot demonstrate that he was prejudiced or that a different result would have been reasonably probable. As noted, GR testified that she wrote the letters to apologize to defendant for lying about the allegations. However, GR further explained that MM "made [her]" write the letter, and that MM and defendant required that she write apology letters as a form of punishment to restore her "privileges." Because GR admitted that she wrote the letters and did not contest their substance, the letters were not admissible for impeachment purposes. See MRE 613; *People v Alexander*, 112 Mich App 74, 76-77; 314 NW2d 801 (1981). Although defendant contends MM will provide an affidavit stating that the letters were provided to defense counsel before trial, no such affidavit was submitted and, in any event, "our review is limited to mistakes apparent on the record." *Payne*, 285 Mich App at 188.

As to the other alleged ground for ineffective assistance of counsel, defense counsel was not ineffective for failing to review GR's forensic interview. After filing a police report, GR participated in a forensic interview. Before trial, defense counsel requested a video copy of the forensic interview but "never received that." The prosecutor agreed with defendant that defense counsel performed below an objective standard of reasonableness by failing to review GR's forensic interview, as the interview would have included GR's disclosures and information regarding the events and defendant's involvement. Defendant contends defense counsel was not prepared for trial and ill-equipped to cross-examine GR and, as a result, the jury did not receive necessary and valuable evidence and could not adequately weigh his defense. Although defendant believes this deficiency caused outcome-determinative prejudice, a different result would not have been reasonably probable. First, the video of the forensic interview is likely inadmissible hearsay. See *People v Douglas*, 496 Mich 557, 576-577; 852 NW2d 587 (2014). Second, the record shows that defense counsel provided a thorough cross-examination of GR, both through her apology letters and other potential inconsistencies in her testimony. And, on appeal, defendant does not provide any argument about any contents of the interview that counsel could have used to bolster the cross-examination.

V. OFFENSE VARIABLE 8 AND ACCURATE INFORMATION

-15-

Defendant argues the trial court violated his statutory and constitutional rights to be sentenced on the basis of accurate information and erred by assigning 15 points for OV 8. Defendant asserts OV 8 should have been assessed zero points, which would reduce his guidelines minimum sentence range, warranting resentencing.

## A. PRESERVATION AND STANDARDS OF REVIEW

"To preserve a sentencing issue for appeal, a defendant must raise the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in [this Court]." *People v Clark*, 315 Mich App 219, 223-224; 888 NW2d 309 (2016). See also MCR 6.429(C). At sentencing, defense counsel objected to the assessment of 15 points for OV 8 and argued in favor of an assignment of zero points, preserving that aspect of this issue. However, defendant did not argue at sentencing that his rights to be sentenced on the basis of accurate information were violated, and that argument is unpreserved for appellate review. See *Anderson*, 341 Mich App at 279.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), superseded by statute on other grounds as stated by *People v Rodriguez*, 327 Mich App 573, 579 n 3; 935 NW2d 51 (2019) (citations omitted). "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438 (citation omitted). "When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a [presentence investigation report], plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015).

Generally, this Court reviews "de novo constitutional challenges and questions of statutory interpretation." *People v Hrlic*, 277 Mich App 260, 262; 744 NW2d 221 (2007) (citations omitted). But this Court "review[s] defendant's unpreserved constitutional claim for plain error affecting his substantial rights." *Anderson*, 341 Mich App at 279. Defendant must demonstrate that "(1) an error occurred, (2) the error 'was plain, i.e., clear or obvious,' and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *Id.* at 279-280, quoting *Carines*, 460 Mich at 763.

## B. ANALYSIS

The trial court properly assessed 15 points for OV 8. Defendant was sentenced on the basis of accurate information and cannot demonstrate plain error affecting his substantial rights regarding his constitutional argument.

"It is well settled that the use of inaccurate information at sentencing may violate defendant's constitutional right to due process. US Const, Am XIV; Const 1963, art 1, § 17." *People v Hoyt*, 185 Mich App 531, 533; 462 NW2d 793 (1990). "A defendant is entitled to be

sentenced according to accurately scored guidelines and on the basis of accurate information. A sentence is invalid when a sentencing court relies on an inappropriate guidelines range." *People v McGraw*, 484 Mich 120, 131; 771 NW2d 655 (2009) (citation omitted). "[I]f a minimum sentence falls within the appropriate guidelines range, a defendant is not entitled to be resentenced unless there has been a scoring error or inaccurate information has been relied upon." *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006). "[D]ue process is satisfied as long as the sentence is based on accurate information and the defendant has a reasonable opportunity . . . to challenge that information." *People v Williams*, 215 Mich App 234, 236; 544 NW2d 480 (1996).

MCL 777.38(1) states that OV 8 involves "victim asportation or captivity." Under MCL 777.38(1)(a), 15 points should be assessed when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." See also *People v Barrera*, 500 Mich 14, 15-16; 892 NW2d 789 (2017). Zero points is appropriate when "[n]o victim was asported or held captive." MCL 777.38(1)(b). "A plain reading of asportation is this: If a victim is carried away or removed 'to another place of greater danger or to a situation of greater danger,' MCL 777.38(1)(a), the statutory language is satisfied." *Barrera*, 500 Mich at 21. "Nothing in the statute requires that the movement be greater than necessary to commit the sentencing offense," and the statute does not exclude "the movement of a victim that is only incidental to that offense." *Id.* "Another place" or a "situation of greater danger" includes a location that is "away from the presence or observation of others," *People v Chelmicki*, 305 Mich App 68, 70-71; 850 NW2d 612 (2014), as well as a location "where others [are] less likely to see defendant committing crimes," *People v Steele*, 283 Mich App 472, 491; 769 NW2d 256 (2009).

Defendant maintains that no asportation occurred because he took GR to the cabin at MM's request after she and GR had been arguing and there was no other reason for the trip. Defendant contends that the cabin was actually safer than the home because GR was no longer near MM, whom she feared. These arguments are unpersuasive and unsupported by the record.

Defendant's presentence investigation report assigned 15 points to OV 8 because defendant drove GR to the cabin. Before the first incident occurred, defendant took GR to the cabin for an overnight trip during the summer before she started her freshman year of high school. GR testified that defendant took her to the cabin because she and MM "were fighting." MM testified there was a "situation" that day, causing her to become "very upset" and requiring she and GR to need "some space." Importantly, MM stated that defendant offered to take GR to the cabin alone. Although defendant's actions helped defuse the situation at home, he took advantage of the situation by moving GR to another location. The record established that this was the first time that defendant and GR were alone at the cabin, which was located in a desolate area.

Whether it was defendant's idea to take GR to the cabin is irrelevant by the plain language of the statute because there is no intent requirement. All that was required was defendant's act of taking GR from the home to the cabin, and that the cabin constituted "another place of greater danger" or "a situation of greater danger" under the circumstances because it was outside of the presence and observation of others, including MM. See *Chelmicki*, 305 Mich App at 70-71. The trial court did not err in concluding that it was, or by assigning 15 points to OV 8.

Because there was no scoring error, defendant was sentenced on the basis of accurate information and it is unnecessary to address the argument regarding his proper guidelines minimum sentence range. Defendant was sentenced within the recommended guidelines range and, because there was no scoring error resulting in a change of the guidelines minimum sentence range, defendant is not entitled to resentencing. See *People v Biddles*, 316 Mich App 148, 156; 896 NW2d 461 (2016).

Affirmed.

/s/ Colleen A. O'Brien
/s/ Christopher M. Murray
/s/ Anica Letica